Good morning, Your Honor. Scott Kalkin and my co-counsel, Ron Bochner, on behalf of Pellant. There are two major issues. Excuse me. This is a $118 case. Is that right? Yes, it is. Well, at least that was it. I'm so used to dealing with $75,000 and above that that struck me in the record. Well, it's not the largest medical bill I've ever seen. We understand. But what I'd like to address is two major issues here. The first is whether the factual inaccuracy threshold that the trial court imposed on the failure to reinvestigate claim. Counsel, I'm sorry, but your voice is trailing off toward the end. I'm sorry. Is that better? Anyway, that is better. Thank you. So whether the summary judgment was properly granted on the claim for failure to reinvestigate on the basis that my client was unable to make this threshold showing of inaccuracy on the credit report. And then secondly, whether that same requirement of threshold inaccuracy ought to carry over in terms of whether the credit reporting agencies were required to provide a response to her request. Are you going to talk about the remand issue, 1446? I think we've addressed that in our brief unless the Court has any questions on it. All right. Very well. So you're going to focus on the summary judgment issue. I think, yes. All right. I think that seemed to me the heart of the case. In any event, it seems to me that the record indicates, at least for purposes of summary judgment, that the plaintiff did, in fact, make a showing of factual inaccuracy in the report. What's the factual inaccuracy? Correct me if I'm wrong. It seems to me reasonably clear, maybe it's not, that your client owed the $118 notwithstanding the failure of any insurance company, either Blue Cross or Blue Shield or Blue whatever it was, to pay. I would respectfully disagree with you, Your Honor. How does she not owe the $118? She got $118 worth of value from Bayside. Am I right about that? You are right about that, yes. And she didn't pay. That's correct. And I read the agreement to say that even if the insurance company doesn't cover you, you still owe the money. Well, I think that that agreement, and Judge Vogel cited the relevant portions of it in his opinion, says we will, not we might, we will bill your insurance company. And if your insurance company doesn't cover you. That doesn't get her off the hook for nonpayment. If they made a promise to bill her insurance company and they never did it. They said as a courtesy. Well, they did say as a courtesy, yes, that's true. We will bill your insurance. But that doesn't say, and maybe we won't do it. In one of her letters to, I forget which credit reporting agency. I think she sent them to everyone. Yeah, whatever it was. And one of them, she says the payment of this debt was the responsibility of Blue Shield. Or Blue Cross. I think Blue Cross was the one who. Right. She makes a little hand note. Yes. Responsibility for this, paying this debt is Blue Shield. Now, where did she get that idea? Well, there was apparently some confusion. What we believe happened, and I have only the record to argue to you from, that the medical provider billed Blue Shield when they should have billed Blue Cross. The claim was denied. And then by the time it could have been or was submitted to Blue Cross, the correct carrier, it was denied on the basis that it was untimely. So. Your beef is not with. Your beef is with the insurance companies or Bayside who billed the wrong person. Well. Who wrote all those letters on her letterhead that are in the record? I believe she wrote the majority of them, and my co-counsel, I believe he sent in a few letters as well. How do you justify running up a $12,000 deposition bill on a $118 case? Well, it's a little bit more than an $118 case, Your Honor. Is a principal involved here? What's the principal? Well, the principal is. She owed the bill. She may or may not have owed the bill. And it was never adjudicated. What were you asking the credit reporting agencies to do? What were they supposed to do in your case? That's the question that came to my mind when I first took a look at this case. Right. And it seems to me there are 12 credit reports that were issued here. And with the exception of the last few when they took the debt off, when it had expired, the 7-year term had expired, every one of them says the debt's accurate. Every one of them says the debt was verified. They don't say anything about the Bayside's obligation to bill the carrier. But what if we had a statement that she disputes that she owes the debt because responsibility of the insurance company? Well, I think that what we're after here and what should have been done here, the goal of the statutes is that the credit report be accurate. Have the maximum possible accuracy. Not that it just be accurate. All right? This report was not accurate, nor was it complete. And that it's either or. It's not both. It's our burden. The report can be incomplete as well as inaccurate. It can also be misleading. And this was because what the credit reporting agencies reported on every one of these reports except the last few, the debt was verified. It means it's true. Veritas. That's where it comes from. It's true. And they say it's accurate, that it is unchanged after they have explored or investigated whatever it was they did or didn't do, as is the case here. That's the problem. And that problem stands not only to this $118 bill, which arguably, and we're taking up your time if you want to look at it, over $118, but it's a much bigger issue than that. You know, counsel, we've been counseled by Congress, among other things, to be on the lookout for class actions that appear to be nothing more than attorneys trolling for fees. Yes. And this case gives, to me, every appearance of that. It's a $118 bill, as far as I can tell from reading every document in the record, your client owes that money. And then all of a sudden these letters start appearing after she just doesn't do anything that suggests that there are lawyers behind the scenes attempting to set up something with the credit reporting agencies. And, you know, I look at this, and to me, frankly, with all respect, it smells like exactly what we've been told to be on the lookout for. Somebody has a beef, and it's converted into this gigantic class action, out of which is going to come very little except a big request for attorneys' fees. And that's the way it looks to me. So where am I going off the cliff? Well, Your Honor, all I can say is these statutes, if you look at the goal of the statutes, it's to make sure, number one, that there is accuracy in reporting, because this is a weighty bit of information that's being passed around about people, not just my client. Well, it's important for people. It's very important for people. Your credit score these days is critical. Absolutely. It's just about everything. And the other thing is this. Instead of straightening out her credit score early on in the game, when there were obviously lawyers involved behind all these letters, you just kept it going, multiplying the operation, trying to turn it into a class action. That's what it looks like to me from the record. Well, I would, first of all, I would respectfully disagree with you, but I mean, I wasn't. She didn't write those letters on her letter. I cannot tell you, Judge. I wasn't part of the case at that time. I don't want to tell you something that is not, or may not be correct. My co-counsel is here. You're pointing at him. That's the culprit? Well, I don't think he's the culprit, but he was involved in the case. We'd be happy to answer that question for you if you'd like it answered. Okay. You know, it looks to me like an illegitimate attempt to get a class action out of nothing. Well, let's leave the class action aside for a minute. Let's just look at this case and what they did and didn't do and what was their obligation. And they didn't perform. I mean, what did they do to verify this? The record is accurate. Well, why don't you be very specific with respect to the word or words in the statute that create the obligation to do something here? All right. I certainly will. All right. Once if a consumer, and I'm referring to Civil Code 1785.16a and b, if a consumer disputes the accuracy or completeness of a debt, the agency shall reinvestigate within 30 days unless it determines the dispute to be frivolous, which didn't happen here except in one agency, in one instance. The agency shall review and consider all relevant information considered by the consumer. The agency being the credit reporting agency. The agency shall consider all relevant information submitted by the consumer. If the item cannot be verified, the truth be determined of it, they need to delete it. Now, in this case, we don't know what they did to verify it or check the accuracy of it. The record is silent on that. We know they had a duty to do it. And the overall goal of the statute is to ensure maximum possible accuracy. That's referring to the Federal statute now, 1681e subdivision b, of the information that's in here. On top of that, let me just touch briefly on the second issue because it touches on this. Just how far does that duty go? I've always been troubled in some of these cases and I've been on others in the past. That's a very good question. That we don't want to make the credit reporting agencies courts of law or interpreters of where the rights are. All we're talking about is reporting information. Isn't that really what it comes down to? You're right. And I think what we're – what I'm telling you is I think the credit reporting agencies, when they can't verify it one way or the other, have a duty to present this information to the world in a nonbiased, balanced way. Okay. Back to Judge Paez's question. What would you have the CRA do specifically? Just add the word, quote, disputed debt, unquote, something like that or what? Absolutely not because that's not really presenting a balanced picture. Well, you want them to write – you're not going to write a law review article on what the status of this $118 debt is. No, we're not. Absolutely. But on the one hand, the reporting agency is saying verified, accurate, implying truth to some degree. And on the other hand, they're saying disputed. Well, anybody can dispute a debt for any reason. They have the information to read it and write up a two or three sentence summary of what was actually at issue here and present that and say the debt is simply can't be verified. It's there, but it can't be verified. That's what I think they should have done here. It can't be verified. And I don't think that's asking them to do some, you know, undertake some huge burden. Well, if it can't be verified, then I guess the statute would say they have to delete it. That's right. And I think that's what they should have done here. So you're essentially asking them to make a legal conclusion. No, I'm not. What I'm saying is – Sure. Say if they would have gotten all this information, they would have received – they would have been apprised of the base center's agreement to volunteer – for the courtesy of your client to build the insurance company. Right? Right. So then somebody at the credit reporting agency would have to think through that. Yeah, they would have to actually think. Well, does this mean that the insurance company has to pay this debt? Or does this mean that the debt doesn't exist? Or does this mean that it's her debt? Right. And they have to make a conclusion. Where does the statute say you have to do that? Well, it says that they have to consider all relevant evidence. They review and consider. And once they do it, presumably that means they have to make some type of a judgment. So Judge Fogel said, well, if they have to make a legal determination, that's outside the statute. I'm not saying they have to make a legal determination. All they have to do is make a determination, can the debt be verified based on what we have here. Now, there's an out for them, too, because they can consider the consumer's information irrelevant or frivolous under the terms of the statute, and then there is no issue. So they could have done that. They could have done that, but they didn't do that. Her attempt to dispute the debt in light of the fact that she received these services and in light of the nature of the letter about the courtesy to bill, that her objection here is just frivolous. They could have done that, but they didn't. And if they would have done that, then we might not be here today. Or we might be here under a very different argument. But they didn't do that. And they presented this debt for over six years to the world as accurate. So in your view, they made a legal call, and they made the legal call against her. They said she owes the debt, it's accurate, she didn't pay it, and we're reporting it. I suppose you could say it's, yeah, they made, I don't know if I would go so far as to say it's a legal call, but they certainly presented it because she owes the money. I'm trying to understand. I'm sorry? Tell me what they did here. I don't know what they did, other than send a form from the credit reporting agency's office to the person, the credit, the collection agency that reported the debt saying, is the debt accurate? And apparently something came back saying, yes. That's all we know. We don't even know if they sent the information my client provided to the credit collection agency, and we certainly know they didn't bother to contact the provider to see what their position was. Very well. Thank you, counsel. Your time for your side has expired. We'll hear from the other side. Thank you.  Thank you. May it please the Court. Steve Newman speaking for TransUnion. I'll be sharing my time with the other appellees. I'm happy to address the arguments made in any order, but I'd like to begin with the Court's permission by focusing on what the California statute actually says. And Civil Code Section 1785.31a specifically limits standing to plaintiffs who have suffered damages as a result of a violation. That causation requirement is a core part of the California statute, and because the statute exists to encourage accuracy of reports, if there is no inaccuracy, there is no damages as a result of a violation. And the California courts interpreting that provision in the Trujillo case, which we cited in our papers and which was addressed in the reply brief as well, make it very clear that that is an important part of the statute. I would submit that it is a judicial screening device of the kind discussed by Judge Fogel, discussed by the First Circuit in the DeAndrade case. And absolutely, a purpose of that rule is to screen out the cases where you have an attorney who perhaps is not operating with purest of hearts. Now, counsel, I happen to like the DeAndrade case, and I understand why you cite it. But the Ninth Circuit happens to have a case called Gorman. Yes. And doesn't Gorman pretty much foreclose the DeAndrade approach? It does not, Your Honor. Let's keep in mind that Gorman is about the duties of the furnisher. And it is about the role of the furnisher of information into the system. And the furnisher in this case is the credit agency? Excuse me, the collection agency? Correct. The furnisher in this case is the collection agency, which is in large part depending on the information provided to it by Bayside, the medical provider. And what Gorman says is that the primary function of the credit reporting agency in this context is to trigger the more searching investigation on the part of the original furnisher. The statute that we are dealing with in its discussion of the credit reporting agency's duties, the credit bureau's duties, is reinvestigation. And I think it's important to keep in mind that this whole reinvestigation process must be completed within 30 days. The purpose of it is really to jog the furnisher. Say, what happened? The consumer has a dispute. You've put this information into our system. You must, you know, verify it within 30 days or else it will be, you know, deleted. Well, the problem with Gorman is that notwithstanding the fact that you're quite right as to what the furnisher is, it still identifies substantively that the information cannot be materially misleading. Doesn't that open a question of fact here? It does not, because there was nothing misleading about this reporting item. At least there's no evidence of anyone being misled. There's no evidence that it would mislead anyone in any material way. The bureau should be. But she disputed that she owed the money. Well, she didn't dispute. Yes, she did. She disputed that she owed the money. She said the money is owed by Blue Cross. Well, she didn't dispute that the money wasn't paid. And it's very important to keep in mind what the report says. And what it says. It says that she's in collection. It went to collection. That's true. That's what it says. It did go to collection. It's true. And when she was – when she requested to have her signed the report. Well, I guess that means she owned – she owes the debt, then. Well, the debt was referred to collection. What the report said after the dispute was the account went to collection. She disputes it. She claims the insurance should have paid it. And, you know, she sent the same information to the bureaus as she did to, you know, insurance is supposed to pay this. Now, insurance didn't pay it. And, you know, remember we're on summary judgment here. There's no evidence that any insurance would have paid this. You know, it's really, you know, to a large degree, you know, lost in the midst of time as to what her coverage actually was. So let me see. You know, I ask counsel, what did – what did – what does he want – what would he expect the credit reporting agencies to do when her letters come in with respect to her report? So as I read the report, it just says it's gone to collection. Is that all it says? Well, that's what it initially said. And then after – And then which one – which part of the record – which is the document in the record where they add this additional information? Well, there were three bureaus here, Your Honor. And if you'll give me just a moment, I will identify them. Well, you can report later. I mean, when your other – Yeah. Is there any significant difference between the treatment by the three bureaus? Are they all consistent? No.  She disputed, and the item was marked as there's a dispute. I mean, it was – that was done as well as it should have been. So a user of the report will see this item went to collection. She has a different story. Your Honor, in the Experian report, it's page 14 of the supplemental excerpt of the record. Thank you. Okay. Thank you. And, you know, the other thing to keep in mind is this only reached the credit reporting system very late in the process. This plaintiff was told numerous times, insurance hasn't paid, you must address this. She did sign a contract that – where she made – the Court talked about one promise that she made, which is if the insurance won't pay, you will pay. There's another promise she made, which is that if there is a delay of payment beyond 90 days, you will pay. And whether the statement that we will bill as a courtesy gives her some sort of legal defense to nonpayment, that is something that is really an adjudicatory question that's really beyond our ability to referee. I mean, was there a courtesy? You know, did the courtesy billing language create a duty to pay? Was there some duty to resubmit? Did she waive this right by not working things out with the insurance company? There is in the record that all – and this is on page 102 of the supplemental excerpt of the record – that she, you know, submitted the Blue Shield denial to Blue Cross, and Blue Cross said we can't process this document provided by another insurance company. You – you know, someone needs to give us the itemized statement of what services were provided even for us to process this. And that happened in January of 2002. This matter didn't go to collections until September 2003. So by the time it reaches us, what are we – what are we supposed to do? What additional thing can the reinvestigation accomplish? When was it first reported to the credit agency? It didn't go to collection until September 2003, and it didn't get to the agency. And that would be the first time? And actually, it was reported after that, because the first contact from the collection agency says this has been referred to collection. You need to address this to protect your credit. And then there was a second letter that said you must handle this immediately. And only after the second letter, about a month later, did CCS report it into the credit reporting system. So from the time of the initial bill for $118 until the time it was first reported by a credit agency, CRA, it's over a year. It's almost two years. Almost two years. All right. Your Honor, I have agreed to split time with my – with my colleagues. Unless the Court has specific questions for me, I would yield my time to Mr. Goheen, who can address the jurisdictional question the Court raised. Very well. May it please the Court, Barry Goheen for the Equifax Defendants. The panel raised a brief question to my worthy adversary regarding the jurisdiction question. We likewise are happy to stand on the briefs on that, unless the Court has specific questions. We did lay out in our briefs what we believe to be the two issues. This is a motion to remand. That's correct, Your Honor. Very well. We do believe that by attempting to invoke the power of the Federal Court to add the Federal claims, that that constituted an acquiescence of the – Well, but that happened – he didn't do that until after the motion to remand was denied. That's correct, Your Honor. I don't find that argument particularly attractive. Okay, Your Honor. We'll stand on our briefs and the other courts that have so held. And then we do believe that her deposition testimony made it very clear it was not at all clear before her deposition testimony. But, you know, when I read that, is it clear that she was seeking – did she mean by that she was seeking $25,000 per class member? In what form? In the complaint or in her deposition? In her deposition. In her deposition, we asked her, would you accept $25,000 to resolve your case, Ms. Carvalho. She said, no, I would not. So then we asked, would then – is $25,000 apiece insufficient to resolve the claims of each of the class members you're purporting to represent? And she said, no, it would not be. So that's the trigger right there. That's – that was not in the complaint. There was not – there was an ambiguous, you know, what this Court has called an indeterminate pleading under Harris. So we believe the Court properly applied this Court's trilogy of cases of Durham, Harris, and Abrego, Abrego, and we believe the remand motion was properly denied. Okay. And I will defer to my colleague. Very well. Thank you, counsel. Good morning, Your Honors. Mayor Fetter for Experian. I would just like to go back to the question raised by Judge O'Scanlan about Gorman and about whether that obviates the approach of D'Andrade because of the language about something that's sufficiently incomplete to be misleading. The reason it doesn't is because the reporting, as co-defense counsel indicated, was completely accurate and not misleading on the face of what was presented to the district court and – Explain. That's exactly what I was getting to, Your Honor. If you look back at the page we referred to earlier, page 14 of the supplemental excerpts of record, what was reported there is really the only thing that could be reported. Could you read it? I don't – I didn't bring that particular page. Yes, certainly. It says this is on the entry for credit consulting services. The status detail says, Status, collection account, $118, passed due as of 10-2004. Account history, collection as of 10-204, 9-203, 11-201. Your statement, quote, This bill arose out of the medical treatment I was covered for by insurance, which was not paid. Close quote. Comment, account information disputed by consumer, parentheses, meets requirement of the Federal Fair Credit Reporting Act. Close paren. This item was verified and updated on 4-2005. Now, what are you referring to here? I've got supplemental excerpt of record of an appellee's volume 1. The supplemental excerpt of record, page 14. Right. That's what this looks like. Right. And I'm reading from the right-hand column. You have a magnifying glass. Yes. Yes. So that bill arose out of the medical treatment was covered by insurance, which was not paid. Comment, account information disputed by consumer meets requirement of the Fair Credit Reporting Act. Yes, Your Honor. How much of that is visible to a subscribing customer? All of it. All of that. In other words, if I subscribe to Experian, for example, I could see that whole page or just the summary verified? No. That is this is exactly the procedure contemplated both by the California Act and the FCRA. I know, but my question is, if I'm an outsider, I'm a business person, I want to check this person's credit, what can I see? You can see this, Your Honor. See all of that? Yes. And that is. That's your answer. You say this. Take a look at Gorman. Take a look at this. No problem. That's what you're telling us. Exactly, Your Honor. This is this is really the only way. Another instance. I talk to people all the time about the failure of excerpts of record, you know, and you put in a 13th generation Xerox copy that nobody can read or see. And you put it and it comes in and the supplemental excerpts. I mean, if this is your smoking gun, you know, it ought to be out there smoking, not hiding. Anyway. Yes. And this is really not only is it what Congress contemplated, it's actually a sensible process. It's there is a dispute that is ultimately a legal dispute where the consumer is saying, I don't know this because I'm saying that the medical group breached his contract. The CRA can't resolve that, but can report, A, that it's disputed, which we do, and B, the consumers provided the opportunity to give a statement of dispute that gets included in the report that is provided. Again, what they want you to do, though, is so you get the collection agency reports the debt to you. She then disputes that with her letter, whatever it is. And then you add this statement in their credit report. But in between, what happened in between to verify? I guess that's what their whole case is about. Well, yes. And, I mean, what is verified is what can be, and this is what cases like the Andrade really go to, what is verified is what can be objectively verified. I mean, one thing Gorman also says, as was referred to before, is that what the CRA basically can do primarily, there are a couple of other things, but primarily is to go back to the furnisher and verify, is this a real debt? Was it incurred? Are you still contending it's owed? And here's the consumer's basis of dispute. Do you verify it in light of that? And they come back and they do verify it. In this type of situation, there really is not more the CRA can do to resolve whether, in fact, she has a valid breach of contract defense. All we can do is report the consumer disputes it and include her statement explaining why. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Trott, Paez